Christopher W. **LIVINGSTON**,      )
    *Plaintiff*      )
          )      **PLAINTIFF'S OPPOSITION TO**
v.      )      **DEFENDANTS' (DE8, 9) FED.R.CIV.P. 12**
          )      **MOTION TO DISMISS**
The **NC STATE BAR**, et al.,      )
    *Defendants*      )
_____/

Plaintiff Christopher W. Livingston opposes Defendant NCSB's (DE8, 9) Motion to

Dismiss and Memorandum in Support and requests that they be denied in all respects, on the

following grounds (herein, "R[number] designates pages of the Record on Appeal in *NCSB v.*

*Livingston*, which may be downloaded by going to the NC Appellate Division's Electronic Filing

Site and searching file number 17-277]; T[number] designates transcript pages from the 15 DHC

15 evidentiary hearing; ¶[number] refers to paragraphs of the Amended Complaint):

### Caption mistakes are not fatal

Though Amended Complaint ¶10 names 13th District Bar as a Defendant, and ¶¶ 12-39 sets

forth in detail 13DB's complained-of activities, and ¶¶453-56 requests relief regarding 13DB, it

asserts by way of defense only its inadvertent omission from the case caption and considers itself

saved. "The title of the complaint must name all the parties[,]" says Fed.R.Civ.P. 10(a), but that

is a guideline to form, not a jurisdictional prerequisite. It is one thing to, say, leave out a party

from the caption and then not mention it in any subsequent papers. *See Anwar v. Fairfield*

*Greenwich Ltd.*, 745 F.Supp.2d 360, 364 n. 5 (S.D.N.Y. 2010). It is another to grant a defendant

the windfall of dismissal with prejudice on grounds of plaintiffs' drafting errors. "It is not

absolutely necessary to list an individual in the caption of the complaint in order to name that

individual as a defendant in the action. *See Johnson v. United States*, 680 F.Supp. 508, 514-15 n.

6 (E.D.N.Y. 1987) ("the omission of a name from a caption is not determinative of whether a defendant is properly in a case"); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1321 (2d ed. 1990) ("Although helpful to the court, the caption ... is not determinative as to the parties to the action")." *Dept. of Economic Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F.Supp. 449, 484 (S.D.N.Y. 1996). Rule 10's purpose is convenience and clarity, not imposition of technical pleading requirements.

As to NCSB's cited authorities, *Winter v. Duncan*, No. 14-CV-00762-DRH, 2015 WL 500522 (S.D. Ill. 2015) seems to have had no caption at all. *Bakari v. May*, No. 3:10-CV-250, 2011 WL 1743728 (S.D. Ohio 2011) seems to cite cases who have no rationale behind them. Neither is as persuasive as *Johnson* and *Dept. of Economic Dev.*, or even Wright and Miller, *supra*.

In addition, 13DB is legally the same entity as NCSB and need not even be named to recover from NCSB. "The district bar shall be a subdivision of the North Carolina State Bar subject to the general supervisory authority of the Council and may adopt rules, regulations and bylaws that are not inconsistent with this Article." NCGS § 84-18.1(a) (in pertinent part). District bars are not subsidiaries or separate entities, but divisions of NCSB that must acknowledge its mastery. Since NCSB controls them, what they do is what NCSB does. It thus appears unnecessary to sue 13DB separately, but Plaintiff does so in the event that 13DB is ruled to be a separate entity. After all, Plaintiff has been wrong before.

Though 13DB should be denied dismissal on the foregoing, Plaintiff should at most need to move to amend the caption to include "The 13th Judicial District Bar" so it matches the substance of the Amended Complaint. "In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance

2

of the amendment, futility of amendment, etc. the leave sought should, as the rules require, be "freely given." *Foman v. Davis*, 378 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). Such motion is likely forthcoming.

## Wrongful Assessment of District Bar Dues

Plaintiff may have inartfully stated the exact constitutional basis for his claim on this matter, and will likely move to amend to cure any labeling defects, but that does not change the facts, or relieve NCSB or 13DB of responsibility, or make the statute in question constitutional. Though Defendants correctly note that Plaintiff has significant legal training and experience, Plaintiff has had to concentrate on changing his career to the very different (and five times harder) regime of biological science, leading to some inevitable decay in proficiency with the complex subjects at issue here, and also no longer subscribes to LEXIS (over $300 per month).

For just such occasions and many others, Fed.R.Civ.P. 8(e) commands: "Pleadings must be construed so as to do justice." No principle of complaint construction is firmer than that "under the liberal rules of federal pleading, the label of a claim is not dispositive. *See Alexander v. Unification Church of America*, 634 F.2d 673, 678 (2d Cir. 1980) (citing *Conley v. Gibson*, 355 U.S. 41, 45-48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). The issue is whether a plaintiff has alleged sufficient facts to state a claim. Given that it is often difficult to know which legal theory will be supported by the facts developed during discovery, a plaintiff should be given some **[*13]** latitude so that a valid claim is not prejudiced by counsel who puts the wrong legal label on a claim. *Cf. Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995)." *Aquilone v. Republic Nat'l Bank*, No. 98 Civ. 5451, 1998 WL 872425 (S.D.N.Y. 1998). Here, counsel and client are identical, since no sane lawyer would take Plaintiff's case after seeing what happens when you sue NCSB.

## State court exhaustion of remedies is unnecessary and futile

NCSB and 13DB argue that all bar dues disputes must be litigated in state court, but as will be seen, many successful bar dues challenges have begun in U.S. District Court on federal question jurisdiction without need to resort to state courts. Constitutional principles sufficed there, and will suffice here, even if there is some applicable state procedure to recover disputed District Bar dues. As it happens, there is none available to Plaintiff. Though District Bar dues are some form of enforced contribution to the government and thus meet that broad definition of "tax," North Carolina does not include them in its general taxation scheme or give aggrieved dues-payers a means of dispute or recovery.

NCSB directs attention to NCGS § 105-379, but Ch. 105, titled Taxation, neither authorizes the collection of District Bar dues nor provides a way to dispute or recover them. NCGS § 105-41(a)(1) imposes a $50 privilege tax on attorneys at law, but that tax is not at issue. § 105-379, which NCSB claims is sufficient possibility of relief, authorizes injunction of illegal or unauthorized taxes. Article 9 is titled General Administration, Penalties, and Remedies, and appears to have been enacted in 2007 as a comprehensive dispute resolution plan for statutory taxes, but it does not include District Bar dues in its scope. *See* NCGS § 105-228.90(a). Refund procedures are in § 105-241.7, and § 105-241.17 authorizes actions challenging tax statutes' constitutionality in Wake County Superior Court only "if all of the conditions in this section are met," which include a contested case hearing per § 105-241.15 before the Office of Administrative Hearings, but OAH as is already seen has no jurisdiction over Chapter 84 matters, and neither does the Department of Revenue, whose notice of final determination is a prerequisite to petitioning OAH for a contested case hearing, so Plaintiff may not even swing open the Wake County Courthouse doors.

If District Bar dues are a tax for purposes of state-court review, then NCGS § 1-253 and § 7A-245(a)(1) and (2) authorizing constitutional claims and declaratory judgments in Superior Court must fall to the specific provisions of Chapter 105 Article 9, which exclude Plaintiff from administratively presenting a claim that would become a ticket to sue. Even if District Bar dues somehow are ruled to be subject to Chapter 105 Article 9 dispute procedures, trying to bring a Superior Court case attempting to untangle the General Assembly's colliding statutes would take years in itself. Therefore, Plaintiff's claims are properly in this Court because either District Bar dues are not a "tax" for federal abstention and comity purposes, or no "plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. That such a procedure *did* exist was key to the holding in *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100 (1981).

*Johnson v. Board of Bar Overseers*, 324 F. Supp. 2d 276 (D.C. Mass. 2004) helps *Plaintiff*, not any Defendant. It cites SCOTUS precedent holding that 42 U.S.C. § 1983 suits for money damages unavailable in the state proceeding cannot be dismissed per *Younger* but must at most be stayed until all state matters are done. *See Deakins v. Monaghan*, 484 U.S. 193, 202 (1988). It also brings up *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 486 (1983): "Challenges to the constitutionality of state bar rules, therefore, do not necessarily require a United States district court to review a final state-court judgment in a judicial proceeding. Instead, the district court may simply be asked to assess the validity of a rule promulgated in a nonjudicial proceeding. If this is the case, the district court is not reviewing a state-court judicial decision. In this regard, 28 U.S.C. § 1257 does not act as a bar to the district court's consideration of the case[.]"

The statute in question, NCGS § 84-18.1, provides:

(b) Any district bar may from time to time by a majority vote of the members present at a duly called meeting prescribe an annual membership fee to be paid by its active members as

a service charge to promote and maintain its administration, activities and programs. The fee shall be in addition to, but shall not exceed, the amount of the membership fee prescribed by G.S. 84-34 for active members of the North Carolina State Bar.

But boundless "administration, activities and programs" are far more expansive than what SCOTUS has held the Constitution to allow, and a simple forever-binding majority vote provides individual lawyers no way to object to improper or unconstitutional expenditures.

*Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228 (1990), does not help Defendants, and also did not hold state court suit necessary, just a suit in U.S. District Court. There, 21 lawyers objected to subsidizing a raft of disagreeably leftist political projects with their compulsory dues, and SCOTUS agreed that the First Amendment forbade it. "Here, the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such matter fund activities of an ideological nature which fall outside of those areas of activity." 496 U.S. at 13. It is bar authorities' responsibility to "include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 16, *quoting Teachers v. Hudson*, 475 U.S. 292, 310, 106 S.Ct. 1066, 1077 (1986). NCSB and 13DB have no such procedures in place.

Non-germane expenditures need not be ideological in nature to violate the First Amendment. Lawyers in Puerto Rico, for example, were relieved from paying for a group life insurance policy advancing neither political ends nor bar regulation (and again, did not have to take their dispute to a Puerto Rico court first). "Without this germaneness check, once a person is compelled to join and support a bar association for legitimate reasons, she could be forced to pay

for any bar activity for any reason or no reason, as long as it did not involve political or ideological expression." *Romero v. Colegio De Abogados De Puerto Rico*, 204 F.3d 291, 301 (1st Cir. 2000). That the insurance plan may have benefited all bar members was insufficient, *see* 204 F.3d at 303, and the "free rider" concern of members benefiting from group advocacy without paying for it is not a factor here; indeed, the Bladen County Bar Association's well-to-do members enjoy a free ride at Plaintiff's expense by forcibly taking his money to fund their private social events but do not allow him to attend. Furthermore, funds not escrowed pending challenge amount to "an involuntary loan" for objectionable purposes; thus, the "pure rebate approach is inadequate." *Id.* at 304, *quoting Ellis v. Brotherhood of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 43, 104 S.Ct. 1883 (1984). All this, said the First Circuit, violated the First and Fourteenth Amendments, which Plaintiff pleaded as well. Amended Complaint ¶453-56. Surely the governmental taking of money to fund private events that divide the profession into those included and those excluded, though they are all supposed to be the same, violates the Equal Protection Clause and the Art. 1 § 19 Law-of-the-Land Clause as well.

Had NCSB and 13DB disclosed that part of Plaintiff's enforced dues would finance social events to which Plaintiff is inexplicably uninvited, Plaintiff could and would have opted out of that amount. Indeed, *none* of Plaintiff's 13DB dues went toward *any* regulatory or quality improvement efforts, as District Bar events cost nothing to put on. An example of *Keller* compliance that would have perfectly alleviated Plaintiff's concerns comes from *Fleck v. Wetch*, 868 F.3d 652 (8th Cir. 2017) (once more, state litigation was unnecessary). The "annual license fee" of the State Bar Association of North Dakota is "$380, $350, or $325, depending on years of practice." 868 F.3d at 654. But in addition to posting a "Keller Policy" on its website and noticing all members by email of proposed lobbying, its fee statements say: "OPTIONAL: Keller deduction

relating to nonchargeable activities. Members wanting to take this deduction may deduct $10.01 if paying $380; $8.99 if paying $350; and $7.90 if paying $325." *Id.* The statements also enclose a separate notice that "describes the holding in *Keller*, explains how SBAND calculates nonchargeable activities each year, and informs members how to object to SBAND determinations." *Id.* at 655. Even the State Bar of Wisconsin, whose (dubious) "public image campaign" was upheld as somehow "germane," allows members to withhold dues and arbitrate claims of extraneous activities. *See Kingstad v. State Bar of Wisconsin*, 622 F.3d 708, 709-10 (7th Cir. 2010) (overruling *Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir. 1996), which further cautioned against automatic Eleventh Amendment immunity for state bars; see concurring opinion).

The foregoing examples raise this non-rhetorical question: why are 13DB and NCSB is so fiercely opposed to such a simple and sensible requirement with which other state bars happily comply? Plaintiff would really like to know. 13DB and NCSB must refund Plaintiff's money, pay Plaintiff damages, and be forbidden from ever doing this again, not even to Plaintiff.

13DB is correct that no cause for selective prosecution lies against it, so its liability ends here. NCSB's does not, even though it tries everything up to and including attempted repudiation of its own written policy.

### Selective Prosecution

"The fact that certain misconduct has remained unchallenged when done by others, or when done at other times, or that it has not been made the subject of earlier disciplinary proceedings, will not be a defense to any charge of misconduct by a member." 27 NCAC 01B .0101. NCSB's official disciplinary policy is thus, by its own terms, intentional discrimination against some lawyers and in favor of others, at whim and without recourse. That this flies in the face of

8

Fourteenth Amendment's Equal Protection Clause, and consequently the North Carolina State Constitution's Law-of-the-Land Clause, concerns NCSB not at all (until just now, when NCSB suddenly realizes that it may be in real trouble this time, and belatedly says that selective prosecution *is* a defense to professional misconduct charges; *see infra*).

Plaintiff provides over 50 pages of dates, times, places, people, words, and actions regarding other lawyers' unaddressed misbehavior, easily satisfying *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) as well above "unwarranted inferences." In general, though selective prosecution claims "must be alleged with sufficient specificity to avoid being conclusory ... there is no heightened pleading requirement imposed on the plaintiff." *McWaters v. Rick,* 195 F. Supp. 2d 781, 791 (E.D.Va.2002). Plaintiff cites *infra* a number of cases denying dismissal on far weaker facts than here.

NCSB inevitably cries "speculation, conjecture, and opinion," DE9 at 11, without specifying which of the Amended Complaint's 456 paragraphs, many of which are drawn straight from public records, might be speculative, conjecturable, or opinionated. Significantly, neither does NCSB outright deny that if the Amended Complaint's allegations are true, the undisciplined lawyers mentioned therein are guilty of serious professional misconduct that has gravely harmed the public, including Plaintiff himself and his family.

### *Younger*, *Rooker-Feldman*, *Heck*, and *Bakewell* are inapplicable

NCSB invokes these cases by way of affirmative defense, but to no effect. Taking the last and simplest first, *Livingston v. Bakewell*, 232 N.C. App. 337, 757 S.E.2d 525 (2014) (unpublished), DE9 at 16-17, only estops Plaintiff from reasserting its *claims*, not from repleading its facts. Since it was decided on 12(b)(6) failure to state a claim, it cannot support any other form of estoppel by judgment, including collateral estoppel, as it found no facts. "The purpose of a Rule

12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (citation omitted) (internal quotation marks omitted).

The other three doctrines miss the mark for one central reason: NCSB's state case against Plaintiff is over and its result is fixed (unless SCOTUS grants certiorari). *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 (1971) abstention is not possible because the state court proceedings in 15 DHC 15 ended with the North Carolina Supreme Court's denying discretionary review and dismissing Plaintiff's appeal no later than 11 May 2018. There is nothing *Younger* from which to abstain. *See Feldman*, *supra*. NCSB's cited authority such as *Fieger v. Thomas*, 74 F.3d 740, 750 (6th Cir. 1996) only applies to an active state case with which the federal courts are asked to interfere. Even if 15 DHC 15 were still percolating through the state courts, the appropriate course regarding damages would be at most to stay the action temporarily. *See Deakins*, *supra*; *Gilbert v. North Carolina State Bar*, 660 F.Supp.2d 636, 648 (E.D.N.C. 2009). As there is no state case left, this federal one must proceed.

Once the result is final, Federal courts lack subject matter jurisdiction to sit as a state appellate court and stay, enjoin, modify, vacate, reverse, or overturn the results of a state proceeding that adheres to some minimum floor of due process. *See Rooker v. Fid.Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of App. v. Feldman*, 460 U.S. 462 (1983). Unfortunately for Defendants, since Plaintiff is not asking "the district court to conduct appellate review of the state court judgment itself, the *Rooker-Feldman* doctrine does not apply. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)." *Thana v. Board of License Commissioners for Charles County, Maryland*, (4th Cir. 2016). Even if Plaintiff receives all requested relief, and he

certainly should, the DHC order will remain undisturbed and in full force. DE9 at 8-9. The injury of selective prosecution stems, as the name suggests, from the prosecution itself, not the result. It will be noted that Plaintiff amended his complaint just before the limitations period expired on the commencement, not the termination, of 15 DHC 15.

### *Heck* cannot bar relief if selective prosecution was unavailable as a defense

Criminal selective prosecution defense is covered in *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480 (1996). It might be a defense to SEC federal administrative proceedings. *See Gupta v. SEC*, 796 F.Supp.2d 503 (S.D.N.Y. 2011). It is certainly a cause for civil relief. Civil rights actions for wrongful conviction or sentence have as a precondition a showing of "the unlawfulness of [a plaintiff's] conviction or confinement, just as it has always applied to actions for malicious prosecution." *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), *quoted in Ballenger v. Owens*, (4th Cir. 2003). 512 U.S. 477, 489 (1994). But this is not an element of Plaintiff's cause for *selective* prosecution or enforcement. "In order to establish a claim for selective prosecution, Plaintiff must allege that (1) a governmental agent or body intentionally accorded the plaintiff different treatment than it accorded other, similarly persons under the same law; (2) either the plaintiff is a member of [a] suspect class or the government's treatment of the plaintiff was entirely arbitrary, irrational, intentional, and unrelated to any governmental interest; and (3) the plaintiff suffered an injury that was caused by the discriminatory treatment." *Hyatt v. Town of Lake Lure*, 225 F.Supp.2d 647, 660 (W.D.N.C. 2002) (citations omitted). Exoneration is not an element

Importantly, *Heck* by its own terms applies only when the underlying case was a criminal prosecution, while disciplinary proceedings are administrative matters of a civil nature. Assuming *arguendo* that selective prosecution is a defense to administrative complaints, Plaintiff has found no authority holding *Heck* to require ultimate exoneration. Even if there were, it would not affect

Plaintiff, because, first, the North Carolina Appellate Division has never approved a selective prosecution defense to lawyer discipline—rather the opposite; *see North Carolina State Bar v. Frazier*, 269 N.C. 625, 636, 153 S.E.2d 367, 374 (1967), oversimplifying a thieving lawyer's plea as "because all have not been prosecuted and punished, he should not be." Citing *Frazier*, *City of Gastonia v. Parrish*, 271 N.C. 527, 532, 157 S.E.2d 154 (1967) seemingly ruled out the possibility of selective *administrative* prosecution as a defense in North Carolina at all; "By analogy it may be said here that it is no defense to the defendants' alleged violation of the zoning ordinance that action has not been taken as to other violators."

Second, DHC ruled that Plaintiff could not use selective prosecution as a defense. This came about when Plaintiff sought discovery on evidence of selective prosecution, which contrary to popular belief is proper in a motion for summary judgment even in the absence of a defensive pleading. *See Dickens v. Puryear*, 302 N.C. 437 441-42, 276 S.E.2d 325, 328 (1981). Plaintiff specifically noted Bettis' untruths under oath, R112-17, and extensive previous professional misconduct, much of it directly against Plaintiff and his clients, such as raising frivolous defenses and accepting innocent third parties' money from the fraudsters who defrauded them, in at least three 15 DHC 15 papers: 10 November 2015 motion to enforce subpoena duces tecum, R58-59, 74; 10 November 2015 motion to compel discovery and for sanctions, R84-86, 95-96; and 12 November 2015 opposition to protective order, R129-130.

In a 13 November 2015 response, NCSB specifically opposed Plaintiff's discovery requests on grounds of "harassment" and that selective prosecution is not a defense to disciplinary proceedings ("There is an argument that the defense of selective prosecution is limited to the criminal context.") and that even if it were, Plaintiff had made no prima facie showing that others had been differently treated because, *inter alia*, Lee Bettis always tells the truth. R150-51. In

other words, you need evidence to prove selective prosecution, but without evidence already in hand, you can't prove the need for discovery of evidence, so discovery should be denied on grounds of Catch-22.

As NCSB wanted, the panel chair ruled on 24 February 2016: "6. The status of the pleadings and the nature of the administrative proceeding do not justify discovery by deposition on the topic of selective prosecution of [*sic*; should be "or"] vindictive prosecution." R231. There was no factual finding as to whether Plaintiff had made a prima facie showing of unfair treatment, so Defendants lack that element of collateral estoppel. Indeed, collateral estoppel runs in Plaintiff's favor, as it is now settled between the parties that selective prosecution is not a defense before DHC. "Whereas res judicata estops a party or its privy from bringing a subsequent action based on the "same claim" as that litigated in an earlier action, collateral estoppel precludes the subsequent adjudication of a previously determined issue, even if the subsequent action is based on an entirely different claim." *Whitacre P'ship v. BioSignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004). It might even amount to judicial estoppel, which protects the integrity of the courts against "the perception that either the first or the second court was misled." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) (quoted in *Whitacre P'ship*, 358 N.C. at 29).

None of foregoing prevents NCSB—whose same appellate counsel thoroughly familiar with the state record on appeal is defending it here—from mustering the chutzpah to misrepresent that "Plaintiff did not raise selective prosecution as a defense before the DHC[.]" DE9 at 9. It is also most curious that NCSB purports to admit to the existence of a selective prosecution defense just to evade Plaintiff's civil claim, as that position seemingly would bind it in all future cases, gifting a silver bullet defense to quite a few DHC defendants. But NCSB cannot here gainsay its

official policy that there is no selective prosecution defense to its senseless capricious discrimination, enshrined in 27 NCAC 01B .0101.

## Selective prosecution claim has been properly stated

It is nothing new or revolutionary to say that Plaintiff may proceed with his claim if he has pleaded systematically (or even one instance of) different treatment that is plausibly the work of "an evil eye and an unequal hand," *Grace Baptist Church v. City of Oxford*, 320 N.C. 439, 445, 358 S.E.2d 372, 376 (1987) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1073 (1886)). NCSB's contention that only suspect classes enjoy equal protection is a considerable overstatement. Granted: "In general, unless a suspect class is involved, disparate treatment 'is presumed to be valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose"'" *King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016) (quoting *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20, 113 S.Ct. 2637 (1993)). Still, "the Equal Protection Clause protects persons, not groups." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097 (1995).

"In order to establish a claim for selective prosecution, Plaintiff must allege that (1) a governmental agent or body intentionally accorded the plaintiff different treatment than it accorded other, similarly persons under the same law; (2) either the plaintiff is a member of [a] suspect class or the government's treatment of the plaintiff was entirely arbitrary, irrational, intentional, and unrelated to any governmental interest; and (3) the plaintiff suffered an injury that was caused by the discriminatory treatment." *Hyatt v. Town of Lake Lure*, 225 F.Supp.2d 647, 660 (W.D.N.C. 2002). *McWaters v. Rick,* 195 F. Supp. 2d 781, 790-91 (E.D.Va.2002). Element (3) is

incontestably satisfied, as Plaintiff even before the judgment had to pay costs for deposing Bettis and was forced to waste months' worth of working time.

NCSB concedes element (1) by not even trying to state any rational reason for its failure and refusal to prosecute its protected lawyers for their words and deeds as pleaded in the Amended Complaint. Element (2) needs only a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000). *Olech* overrules any contrary position in *Oyler v. Boles*, 368 U.S. 448, 456 (1962). Plaintiff has further shown from years of NCSB's own publications that solo and small-firm lawyers are vastly more likely to be disciplined than large-firm and government lawyers, which defies all logic and common-sense expectations. Are we expected to believe that the thousands of large-firm and government lawyers *never* commit *any* serious professional misconduct, even in the face of daily temptations to bill more, convict more, win more? *Taylor v. Town of Franklin, N.C,*, No. 2:06cv13, 2007 WL 674577 *7 (W.D.N.C. 2007): "Although such claims "must be alleged with sufficient specificity to avoid being conclusory ... there is no heightened pleading requirement imposed on the plaintiff." *McWaters,* 195 F. Supp. 2d at 791. *Hyatt* went on to deny qualified immunity to individual government defendants for selective prosecution, noting that *Olech* stated nothing new, but did provide plenty of notice to reasonable officials in those defendants' shoes that selective enforcement is illegal and suable.

Just as in *Olech*, the precipitating event was a lawsuit against the government in question, ¶¶105-107, plus Plaintiff's beating the central charge in 06 DHC 11 (despite NCSB counsel's gratuitous rudeness and arrogance toward Plaintiff, ¶83, and despite DHC ignoring Plaintiff's ultimately successful summary judgment motion and leaving Plaintiff hanging for 14 months, ¶¶90-98). *State v. Garner*, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995) forbids prosecution motivated by "a defendant's decision to exercise his statutory or constitutional rights. *United*

*States v. Goodwin*, 457 U.S. 368 (1982). In order for a selective enforcement claim to prevail, the defendant must show the prosecutorial system was motivated by a discriminatory purpose and had a discriminatory effect. *Wayte v. United States*, 470 U.S. 598 (1985)." "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)." *Goodwin*, 457 U.S. at 372. Plaintiff "must show more than simply that discretion has been exercised in the application of a law resulting in unequal treatment among individuals; he must show that the exercise of that discretion there has been intentional or deliberate discrimination by design." *In re Register*, 84 N.C. App. 336, 341, 352 S.E.2d 889, 892 (1987) (citations omitted) (quoted in *State v. Burroughs*, 196 N.C. App. 178, 674 S.E.2d 480 (2009).

Termination of the underlying proceedings in Plaintiff's favor is not an element of a selective prosecution or unequal treatment claim. In *Olech*, the key modern "class-of-one" case, the plaintiffs were never even prosecuted, but as a result of a successful unrelated lawsuit against the defendant authorities, had been "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." All Plaintiff is saying is that Defendants have refused to discipline many other lawyers who have committed similar or far worse misconduct, much of it against Plaintiff and his family.

The complained-of action must have "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Thus, a plaintiff must show not only that similarly situated individuals were treated differently, but that there was "clear and intentional discrimination." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Factors include (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting

members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings. *Sylvia Dev.*, 48 F.3d at 819 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). Factors (2) and (4) are satisfied by 27 NCAC 01B .0101, NCSB's official policy of intentional and irrational discrimination, and (3) by the same rule's disallowance of selective prosecution as a defense, as well as ¶115: "NCSB did not offer a plea bargain of any sort even though Plaintiff asked about it, did not inform Plaintiff it would be seeking active suspension until Plaintiff asked about it during a break after trial started, and never inquired as to whether Plaintiff might be having problems with depression, mental illness, substance abuse, or other ailments that often factor heavily in professional misconduct and for which NCSB can offer help and treatment."

Only if the government's actions have a rational basis may Plaintiff's action fail. *See Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548 (4th Cir. 2013). NCSB seems to offer none. *Olech* firmly established that unequal treatment, without much more, is suspect enough, and the Fourth Circuit has faithfully and repeatedly invoked *Olech* to uphold, or at least to foreclose immediate dismissal of, class-of-one claims. Though recreational dancing is not First Amendment-protected expression, singling out one dancer for banishment without rational basis is Fourteenth Amendment anathema. *See Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 263 (4th Cir 2005). *Martin v. Duffy*, 858 F.3d 239, 250-51 (4th Cir. 2017) backed a prisoner's rights to file grievances without subsequent retaliation, for which qualified immunity was no defense and *Heck* exoneration no prerequisite.

Favorable *Olech* cites include *Patterson v Strippoli*, 639 Fed.Appx. 137 (3d Cir. 2017), (family ticketed twice for basketball goal in street while five neighbors were not); *Briner v. City of Ontario*, 370 Fed.Appx. 682, 705-06 (6th Cir. 2010) (sign ordinance enforced against plaintiffs but not others); and *Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383 (5th Cir. 2008) (improper motive includes preventing the exercise of a constitutional right).

### NCSB's own statistics prove discrimination against solo practitioners

Statistics matter "in cases in which the existence of discrimination is a disputed issue." *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 339 (1977). Here, NCSB has helpfully compiled records proving that it systematically discriminates against solo and small-firm practitioners, complete with pie charts and other thoughtful graphics. Logically, big-firm lawyers are at least as subject to ethical temptation, since in their early years they must rack up billable time furiously, and if they make partner-manager-shareholder, they then must pay the bills for large staffs, impressive offices, and massive overhead. It is beyond credibility that almost all big-firm lawyers are ethically perfect, so the reason for their escape from judgment must be something other than actual innocence.

*Hunter v. Underwood*, 471 U.S. 222, 227 (1985) found "the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was 'indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites.'" *Chavez*, 251 F.3d at 638. Though solos are only 41% of North Carolina lawyers, they are 74%, or three-quarters, of lawyers disciplined in DHC orders. ¶¶117-23. The ratio 74/41 works out to 1.8, exceeding *Hunter*'s threshold.

The reason for disparate treatment cannot be lack of resources, since each of the 17 staff counsel at NCSB averages not even three DHC cases and two days in court per year, yet somehow require a full complement of paralegals and investigators to help them achieve even that, and the celebrated Bar Center sits 97% empty. ¶¶124-35. Lawyers are easy to find, as each must keep an active address on file, and if a lawyer cannot be found, then failure to cooperate with an investigation or contest a disciplinary action results in default. These facts prevent NCSB from hiding behind *Selective Service Sys. v. MPIRG*, 468 U.S. 841, 863 (1984) where "of the draft-eligible population of 9,039,000 men, 674,000 had failed to register[.]" (Marshall, J., dissenting). "The barrier to prosecuting Military Selective Service Act violators is not so much the Government's inability to discover a birth date or date of registration as the difficulty of in identifying the 674,000 nonregistrants." 468 U.S. at 863.

"Thus, there are four elements to a 'class of one' Equal Protection claim: (1) treatment that is intentionally; (2) different; (3) from others similarly situated; (4) without a rational basis for the difference." *Kowalski v. Berkeley County Public Schools*, No. 3:07-CV-147, 2009 WL 10675108 *11 (N.D.W.Va. 2009) (citing *Willis* at *id*.). NCSB does not bring DHC cases by accident, but by premeditated intent, satisfying element (1). Elements (2), (3), and (4) are shown by both NCSB's own records proving disciplinary discrimination against solo practitioners and Plaintiff's own experience compared to that of at least six known similarly situated lawyers, to wit, they committed the exact same and far worse misconduct for which Plaintiff was prosecuted, but NCSB knows about this and has done absolutely nothing, despite NCSB's "polar star" of public protection. Among these lawyers' victims are Plaintiff himself and his family, but apparently these lawyers are above the law, while Plaintiff and his family are beneath its protection, so long as NCSB is running the show. Nowhere does NCSB offer a credible rationale for its double standard.

"As the Seventh Circuit has explained, in a case involving racial profiling in traffic stops: 'In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.' *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001)." *United States v. Hare* (4th Cir. 2016). Plaintiff has done just so, generally in ¶¶108-16 and specifically as to at least six lawyers that NCSB has refused to prosecute or discipline.

Some courts require even less. "Therefore, plaintiffs do not have to provide the court with the name of an individual who was not stopped; instead they may attempt to use statistics to show that the [police] treated them differently than other motorists who were similarly situated." *Chavez*, 251 F.3d at 640. "*See also United States v. Alabi*, 597 Fed.Appx. 991, 996 (10th Cir. 2015) (identifying "three possible methods of proving discriminatory effect in a selective-enforcement case: statistical evidence; the identification of a similarly situated individual who could have been, but was not stopped and arrested; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similar discriminatory behavior")" *Johnson v. Holmes*, No. 3:16cv16, 2017 WL 4707463 *6 (W.D.Va. 2017) (denying parts of officers' summary judgment motion). Note that the requirement is just *one* other person, and Plaintiff has named half a dozen. This has happened not just once, but repeatedly and systematically for 12 years.

NCSB, DE9 at 17, says Plaintiff has not alleged that he notified NCSB of other lawyers' misconduct. As NCSB knows full well, its own confidentiality rule forbids Plaintiff to disclose whether he has filed any grievances against any other lawyer, or whether he knows of others who

have done so, without NCSB or complainees' consent. Plaintiff can only remind NCSB of what is already more than sufficient public knowledge of misconduct, including but not limited to:

**Riddle, Garriott, Reich**

In 06 DHC 11, NCSB prosecuted and obtained discipline (a public admonishment) for UPL by ghostwriting. ¶¶140-48. At the same time, Utah (not North Carolina) lawyers Daniel Garriott (his ghostwriter even misspelled his name "Garriot" on his motion to dismiss) and Bret Reich submitted identical motions to dismiss, purportedly written and signed pro se, in Plaintiff's 05 CVD 340 action against them in Bladen County District Court. Though NCGS § 84-2.1 defines "practice law" as *inter alia* "the preparation and filing of petitions for use in any court, ... or assisting by advice, counsel, or otherwise in any legal work;" yet NCSB refused to take action against them even though all it had to do was inform its own Authorized Practice Committee and ask the appropriate district attorney to enjoin and indict UPL per § 84-7. ¶¶150-53.

Later, to show how easy it is, NCSB successfully prosecuted Plaintiff again for UPL in 15 DHC 15 solely because he accepted clients referred to him by people who were ghostwriting. Particularly since Riddle, Garriot, and Reich did their UPL in a North Carolina court (the integrity of which NCSB is supposed to protect) to Plaintiff's (remember, even Plaintiff is part of the public that NCSB is supposed to protect) detriment, NCSB's refusal to prosecute them was and is inexcusable. It also began a 12-year pattern of official NCSB discrimination against Plaintiff and in favor of whoever harms Plaintiff, his clients, and his family.

**Bettis**

As to Lee Bettis, NCSB has full actual knowledge of his misdeeds against Plaintiff and his clients, and that Bettis is a convicted child abuser and impaired driver with obvious self-control and substance abuse issues who has brought the profession into public discredit and ridicule, not

to mention put innocent people's lives, safety, and property at grave risk. Any other lawyer would be offered the options of either a confidential treatment contract or a public disciplinary action. But because Bettis was key to the case against Plaintiff, Bettis is untouchable.

Too long to rehash here, ¶¶247-452 gives names, dates, places, and where possible exact quotes detailing Bettis' misconduct, including but not limited to threatening Plaintiff's safety (recall that Bettis claims to be some sort of mob lawyer with clients including John Gotti), contacting two of his clients without permission, swearing at him before witnesses and on the phone, threatening to sue him without any basis in fact or law (exactly what NCSB disciplined Plaintiff so severely for), gross and gratuitous disrespect, misrepresenting numerous facts and laws to courts, submitting a proposed order with findings that the judge did not make and which the judge noticed and returned, representing both a thief (Bob Lindsey) and the people he stole from (Bob and Colleen Lock and Phil Manger), continuing to represent Manger and claiming Manger does not owe the $89,400 that this Court awarded Plaintiff's clients against Manger, and misrepresenting many material facts to NCSB in an ultimately successful effort to get Plaintiff's law license suspended. NCSB's deliberate and knowing refusal to discipline Bettis or at least get him some help for his substance and anger problems is without rational basis and has caused Plaintiff and his clients to distrust, putting it mildly, the courts and disciplinary system.

**Parsons**

As to Gary Parsons, he and NCSB have a close relationship, as seen from the *Livingston v. Bakewell* complaint that NCSB sent him and which he filed as an exhibit in *Caraballo*. There is no other reason for him to have obtained that complaint out of the thousands filed every month in Wake County Superior and District Courts. This chummy relationship, and the unwillingness to admit that people who complain about Plaintiff may also be in the wrong sometimes, is why

Parsons was able to overcharge clients by 700%, file false timesheets under oath, and file false statements under oath that Plaintiff has paid nothing (Plaintiff has the original money order receipts proving otherwise) with absolute impunity. NCSB knows full well about this, because it monitors Plaintiff's federal cases and could see that Parsons began the process of registering the judgment in Bladen. ¶¶226-45. False swearing is easily cause for active suspension or disbarment. ¶246. It would not require a day's work to prepare an airtight case against Parsons, and barely another day to try him before DHC, but NCSB refuses without reason to do something so simple.

**Wallace, plus Middleton and Speer**

As to Mona Lisa Wallace, she and her for-profit war on family swine farmers, incorporating illegal and discriminatory case-running to recruit hundreds of naïve clients all over southeastern North Carolina, appeared not just in "a newspaper article" but in dozens of articles since July 2013 by sympathetic media, particularly the Raleigh *News and Observer*, which is NCSB's hometown newspaper. Attached are just a few of them, most notably a 28 April 2017 N&O piece covering Wallace's erstwhile confederates Richard Middleton and Charles Speer, out-of-state lawyers who obtained clients the old-fashioned way—case running—that Wallace happily accepted, knowing full well they had been illegally recruited. A Wilmington *Star-News* article of 24 September 2013 related the specific complaint of a Clarkton (Bladen County) resident that a Middleton Law Firm case runner barged onto her porch uninvited one day and tried to sell her on hog farm litigation even though she had no hog farm problem and did not want a lawyer. The Sampson *Independent* ran a number of stories in late 2013 on case running, including an October 2013 article relating Speer and Middleton's throwing all blame on Wallace, for whom they had been working and who had "actively assisted our law firm [which was not admitted pro hac at the time] in preparing and drafting complaints and other pleadings," the same offense of assisting UPL

for which NCSB prosecuted Plaintiff. But Speer and Middleton said nobody had complained to NCSB and presumably they had received no letters of notice or other enforcement action from NCSB. So NCSB thinks assisting UPL is bad when Plaintiff does it, but perfectly acceptable when Mona Lisa Wallace does it.

Likewise, filing claims with incorrect allegations against people who prove to be not responsible for damages is a grave offense when Plaintiff does it, but right as rain when Wallace does it, particularly when those falsely accused are Plaintiff's family and hundreds of other innocent, law-abiding farm families. Summarizing the Amended Complaint, Wallace enshrined at least the following misrepresentations in Wake County files 13 CV 9126 and 13 CVS 10407, so sloppily prepared that she failed even to get the entity name right (The Turnbull Company, LLC):

¶¶ 174-81: Plaintiff's family intentionally polluted neighbors' property, when it is judicially noticeable that the closest of those neighbors lives 0.75 miles away, most of them live over two miles away, and two of the complainants lived 25 miles away. Plaintiff's family could not possibly have discharged waste onto those properties if they had *tried* to.

¶¶200-13: Plaintiff's family "negligently, improperly, and/or grossly mismanaged and operated" their farm, violated setback requirements, deprived neighbors of use of their property, generated "excessive buzzards" and truck traffic, all of which are judicially noticeably false by the fact that several families live much closer to, and two of them *on*, the farm property than Wallace's clients without ever complaining (for that matter, Wallace's clients never complained in the then-20-year history of the family farm, nor have any complained since).

Additionally, in NCED 7:14cv180-BR, DE32 at 38, Wallace kept slinging calumny at Plaintiff's family, falsely stating "Turnbull Company Farms LLC [*sic*; she *still* cannot get right something as simple as a company name] ... adds to the nuisance by the additional volume of

[Smithfield's] large hog trucks traveling on Highway 53 past the Plaintiffs' homes." This refers to the intersection of 53 and Gum Shaw Road, through which Plaintiff has driven thousands of times and has hardly ever seen farm-related trucks there, since at most an average of one large truck a day, many of which do not belong to Smithfield, visits Plaintiff's family farm.

¶¶188-91: Wallace organized a defamatory media campaign designed to prejudice juries against family hog farms and to recruit more plaintiffs to her new litigation, a campaign that continues to this day (compare NCSB witness' false testimony in 15 DHC 15 that Plaintiff had appeared on TV news calling certain lawyers "fraudsters and money launderers" *just one time*, T622, which never even happened, but led to severe punishment for Plaintiff anyway).

¶¶221-23: Wallace recruited only African-American complainants not of Hispanic origin, though many persons of European and Latin American descent live closer to Plaintiff's family's farm than do her clients.

So it is seen that Mona Lisa Wallace has been violating the same rules (*inter alia*, RRPC 3.1, 4.1, 4.4(a), and 8.4(d)) that NCSB very harshly applies to Plaintiff, defaming and distressing hundreds of law-abiding farm families and costing Smithfield untold millions. NCSB does not deny that she is guilty of serious professional conduct and caused incalculably more public harm than Plaintiff ever supposedly did. But NCSB will not touch her and even claims not to be aware of the problem, though her exploits and Speer-Middleton case running have been reported in its hometown paper for five long years. The only explanations are her generous financial support for the Democrat Party, ¶225, delight in seeing Plaintiff's family dragged through the mud, and sheer discrimination in favor of wealthy and politically connected lawyers.

### *Corum* claims

After 17 pages arguing that Plaintiff has no federal remedy, NCSB says Plaintiff must have a state law remedy, *see* DE9 at 19, without hinting what that might be. Defendants Hodge and Silverstein have yet to be served, but when they are, the same counsel will doubtless argue that Plaintiff now does *not* have a state remedy. Should Silverstein and Hodge prove exempt from suit, this is no problem, because the North Carolina Supreme Court has installed an uninterruptible power supply of justice that automatically connects rights-deprived citizens to the State itself.

Even though its lawyers enjoy what looks like the lowest workload in American legal history, and even though they occupy a palatial new building whose courtrooms lie almost unused, and even though they are virtually guaranteed to win before DHC every time, and even though its reputation as a private police force for the big firms could and would be greatly rehabilitated by disciplining the likes of Parsons, Bettis, and Wallace for their plain professional misconduct, NCSB adamantly sits on its hands. Sadly, no writ lies to compel NCSB to discipline those who intentionally abuse Plaintiff and harm his former clients and defame his family. *See Boyce v. North Carolina State Bar*, __ N.C. App. __ (2018) (slip op.). So it is seen that NCSB's "polar star" is not public protection, but private revenge against Plaintiff for itself and its favored lawyers.

Sovereign or governmental immunity, and in the case of Silverstein and Hodges absolute prosecutorial immunity, is to say the least a tough nut to crack when seeking damages. *Imbler v. Pachtman*, 424 U.S. 409 (1976) bestowed *carte blanche* upon criminal prosecutors to do anything they want to anybody they want, for any or no reason, without the slightest consequence whatsoever, period, so long as it is in their capacity as prosecutor. Most, and perhaps all, courts have extended *Imbler* to legalize administrative prosecutors' constitutional vandalism as well. *See Ostrzenski v. Seigel*, 177 F.3d 245, 249 (4th Cir. 1999) (citing a string of opinions supporting its

holding that *Imbler* exempts medical disciplinary authorities from all responsibility for their misdeeds). *See*, *e.g.*, *Fuller v. Wake County*, __ N.C. App. __, 802 S.E.2d 106 (2017).

But the North Carolina Supreme Court has cleared a way around this nonsense. "This Court could hardly have been clearer in its holding in *Corum* [*v. University of North Carolina*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992)]: '[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution.'" *Craig v. New Hanover Co. Bd. Of Educ.*, 363 N.C. 334, 338, 678 S.E.2d 351, 355 (2009). "It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity. ... Thus, when there is a clash between these constitutional rights and sovereign immunity, the constitutional rights must prevail." *Corum*, 330 N.C. at 785-86 (quoted in *Craig*, 363 N.C. at 339). These holdings by North Carolina's highest court of course bind all federal courts. Alternative pleading of *Corum* and *Craig* relief, if other state remedies prove ineffective, is allowed, and Plaintiff has done just that in ¶454. *See Evans v. City of Durham*, No. 1:07cv739, 2011 U.S. Dist. LEXIS 156711 *148-49 (M.D.N.C. 2011) (rev'd and remanded in part on other grounds *sub nom Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012)).

There is no case for negligence such that a tort claims act before the Industrial Commission could be even attempted. It is, naturally, just fine with Plaintiff if Hodge and Silverstein can be held personally liable, but that is admittedly unlikely. Thus NCSB, a state agency created by statute (though that statute provides for essentially no state oversight and is little more than a letter of marque and reprisal that lets the privateers in charge of NCSB do anything they want), *is* the

State and must pay Plaintiff for selective prosecution, should its employees Silverstein and Hodge prove immune. However, a final ruling on *Corum* and *Craig* (other than complete denial of the Motion under response) should wait until after Silverstein and Hodge have been served, which will be before their 90 days are up.

WHEREFORE Plaintiff requests that DB13 and NCSB's (DE8, 9) Motion to Dismiss and Memorandum in Support be denied in all respects, or in the alternative that it be held in abeyance pending service of process on the remaining Defendants, and that any dismissal be without prejudice and with leave to amend in an attempt to cure any pleading deficiencies.

Respectfully submitted,

/s/Christopher W. Livingston
Christopher W. Livingston, Plaintiff Pro Se, NCBN 27282
PO Box 220, White Oak NC 28399
Phone 910 876 7001
Email usriflecaliber30m1.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **15 June 2018** I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of such filing to:

David R. Johnson
The North Carolina State Bar
217 East Edenton Street
Raleigh NC 27601
djohnson@ncbar.gov

And that hardcopy will be served by U.S. Mail, first class postage prepaid, no later than **18 June 2018** on the same.

Defendants Hodge, Silverstein, and Bettis have neither been served with initial process nor voluntarily appeared yet.

/s/Christopher W. Livingston
Christopher W. Livingston, Plaintiff Pro Se, NCBN 27282
PO Box 220, White Oak NC 28399
Phone 910 876 7001
Email usriflecaliber30m1.com