UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
FILE NO.: **7:18-cv-5-D**

Christopher W. **LIVINGSTON**,    )
    *Plaintiff*    )
    )    **PLAINTIFF'S OPPOSITION TO**
v.    )    **INDIVIDUAL DEFENDANTS' (DE20-21, 26-27)**
    )    **FED.R.CIV.P. 12 MOTION TO DISMISS**
The **NC STATE BAR**, et al.,    )
    *Defendants*    )
_____/

Plaintiff Christopher W. Livingston opposes Defendants Hodge, Silverstein, and Battis'

Motions to Dismiss and Memoranda in Support and requests that they be denied in all respects, on

the following grounds (herein, "R[number] designates pages of the Record on Appeal in *NCSB v.*

*Livingston*, which may be downloaded by going to the NC Appellate Division's Electronic Filing

Site and searching file number 17-277]; T[number] designates transcript pages from the 15 DHC

15 evidentiary hearing; ¶[number] refers to paragraphs of the Amended Complaint):

### General principles of preanswer motions

To state a claim for which relief may be granted at law, and to obtain discovery of evidence

likely to prove its averments, the Amended Complaint "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In

reviewing a 12(b)(6) dismissal, we construe factual allegations in the nonmoving party's favor,

treating them as true, and we will affirm a dismissal for failure to state a claim only if it appears

that the plaintiffs would not be entitled to relief under any facts which could be proved in support

of their claim." *Mayes v. Rapoport*, 198 F.3d 457, 460 (4th Cir. 1999) (internal quotation marks

omitted). *See also Elliott v. American States Ins. Co.*, __ F.3d __ (4th Cir. 2018) (slip op. at 17).

Plaintiff may have inartfully stated the exact constitutional basis for his claims, and will likely

move to amend to cure any labeling defects, but this is not dispositive. For all litigants, Fed.R.Civ.P. 8(e) commands: "Pleadings must be construed so as to do justice."

No principle of complaint construction is firmer than that "under the liberal rules of federal pleading, the label of a claim is not dispositive. *See Alexander v. Unification Church of America*, 634 F.2d 673, 678 (2d Cir. 1980) (citing *Conley v. Gibson*, 355 U.S. 41, 45-48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). The issue is whether a plaintiff has alleged sufficient facts to state a claim. Given that it is often difficult to know which legal theory will be supported by the facts developed during discovery, a plaintiff should be given some latitude so that a valid claim is not prejudiced by counsel who puts the wrong legal label on a claim. *Cf. Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995)." *Aquilone v. Republic Nat'l Bank*, No. 98 Civ. 5451, 1998 WL 872425 (S.D.N.Y. 1998). Here, counsel and client are identical, if for no other reason than that no sane lawyer would take Plaintiff's case after seeing what happens to North Carolina lawyers when they sue NCSB.

Plaintiff may have inartfully stated the exact constitutional basis for his claim on this matter, and will likely move to amend to cure any labeling defects, but that does not change the facts, or relieve NCSB or 13DB of responsibility, or make the statute in question constitutional. Though Defendants correctly note that Plaintiff has significant legal training and experience, *see* DE27 at 4-5, Plaintiff has had to concentrate on changing his career to the very different (and five times harder) regime of biological science, leading to some inevitable decay in proficiency with the complex subjects at issue here, and also no longer subscribes to LEXIS (over $300 per month).

But now that NCSB has mentioned the subject, Plaintiff will insist that the adversarial system be enforced evenhandedly, not just against Plaintiff as it so often is. In particular, arguments that Defendants have not made in their well-counseled dismissal motions and

memoranda are supposed to be deemed abandoned; nothing outside their four corners may enter, whether by reply or by court intervention. Admissions in the same are supposed to be binding, *e.g.*, defense counsel for NCSB has conceded that Plaintiff is without a remedy against his other clients Defendants Silverstein and Hodge, *see* DE27 at 15-16, thus admitting that NCSB is liable under *Corum v. University of North Carolina*, 330 N.C. 761, 788, 413 S.E.2d 276, 293 (1991).

For all litigants, Fed.R.Civ.P. 8(e) commands: "Pleadings must be construed so as to do justice." No principle of complaint construction is firmer than that "under the liberal rules of federal pleading, the label of a claim is not dispositive. *See Alexander v. Unification Church of America*, 634 F.2d 673, 678 (2d Cir. 1980) (citing *Conley v. Gibson*, 355 U.S. 41, 45-48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). The issue is whether a plaintiff has alleged sufficient facts to state a claim. Given that it is often difficult to know which legal theory will be supported by the facts developed during discovery, a plaintiff should be given some latitude so that a valid claim is not prejudiced by counsel who puts the wrong legal label on a claim. *Cf. Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995)." *Aquilone v. Republic Nat'l Bank*, No. 98 Civ. 5451, 1998 WL 872425 (S.D.N.Y. 1998). Here, counsel and client are identical, if for no other reason than that no sane lawyer would take Plaintiff's case after seeing what happens to North Carolina lawyers when they sue NCSB.

### Caption mistakes are not fatal

Though Amended Complaint ¶10 names 13th District Bar as a Defendant, and ¶¶ 12-39 sets forth in detail 13DB's complained-of activities, and ¶¶453-56 requests relief regarding 13DB, it asserts by way of defense only its inadvertent omission from the case caption and considers itself saved. "The title of the complaint must name all the parties[,]" says Fed.R.Civ.P. 10(a), but goes on to say that "the title of other pleadings, after naming the first party on each side, may refer

3

generally to other parties."  Plaintiff thus did not even have to name 13DB in his Amended Complaint's caption.  It is not the same thing as leaving out a party from the complaint's caption and also not mentioning the party in any subsequent papers.  *See Anwar v. Fairfield Greenwich Ltd.*, 745 F.Supp.2d 360, 364 n. 5 (S.D.N.Y. 2010).  It is another to grant a defendant the windfall of dismissal with prejudice on grounds of plaintiffs' drafting errors.  "It is not absolutely necessary to list an individual in the caption of the complaint in order to name that individual as a defendant in the action.  *See Johnson v. United States*, 680 F.Supp. 508, 514-15 n. 6 (E.D.N.Y. 1987) ("the omission of a name from a caption is not determinative of whether a defendant is properly in a case"); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1321 (2d ed. 1990) ("Although helpful to the court, the caption ... is not determinative as to the parties to the action")."  *Dept. of Economic Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F.Supp. 449, 484 (S.D.N.Y. 1996).  Rule 10's purpose is convenience and clarity, not imposition of technical pleading requirements.

### Hodge and Silverstein are liable for selective prosecution

Hodge and Silverstein cite *United States v. Venable*, 666 F.3d 893 (4th Cir. 2012) as controlling, which it is.  Unfortunately for them, it runs in Plaintiff's favor.  Venable, an African-American, claimed selective prosecution when the Government indicted him, but not his two Euro-American accomplices in stealing a number of firearms, for felon-in-possession per 18 U.S.C. § 922(g)(1) under "Project Exile."  *See Venable*, 666 F.3d at 895-98.  With "considerable distaste" for the Government's "obdurately declin[ing]" to explain in more than the most coy of terms its charging decision process, the district court deemed itself compelled to deny dismissal.  *See id.* at 900.  The Fourth Circuit evaluated his appeal on whether Venable had come up with "some evidence making a credible showing that (1) similarly situated individuals of a different race were

not prosecuted; and (2) the decision to prosecute was invidious or in bad faith. *See United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)." *Id.* at 900.

Hodge and Silverstein insist that Plaintiff must show their protected lawyers to have done the *exact* same thing for which Plaintiff was prosecuted, *i.e.*, "filing frivolous lawsuits against opposing counsel." DE 27 at 14. (Apparently, NCSB is no longer in the business of protecting law-abiding *members of the public* against frivolous lawsuits such as Mona Lisa Wallace's anti-agriculture onslaught, ¶¶154-225, which has already cost three innocent families their entire livelihoods and rendered their farms worthless—just well-connected "opposing counsel.") This is not what "similarly situated" means for equal protection purposes. "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them. *Olvis*, 97 F.3d at 744." *Venable* at 900-01. Venable did not make the cut, chiefly because the other two defendants' offenses fell under different jurisdictions and also that they elected to cooperate at the first opportunity. "It is largely dispositive here that different prosecutors in different jurisdictions under differing sovereigns made the different prosecutorial decisions as to [white defendants] Turner and Zechman on the one hand, and Venable on the other." *Id.* at 901.

### Selective prosecution is not a defense before DHC

"The fact that certain misconduct has remained unchallenged when done by others, or when done at other times, or that it has not been made the subject of earlier disciplinary proceedings, will not be a defense to any charge of misconduct by a member." 27 NCAC 01B .0101. NCSB's official disciplinary policy is thus, by its own terms, intentional discrimination against some lawyers and in favor of others, at whim and without recourse. That this flies in the face of Fourteenth Amendment's Equal Protection Clause, and consequently the North Carolina State

5

Constitution's Law-of-the-Land Clause, concerns NCSB not at all (until just now, when NCSB suddenly realizes that it may be in real trouble this time, and belatedly says that selective prosecution *is* a defense to professional misconduct charges; *see infra*). "Under § 1983, retaliation by a public official for the exercise of a constitutional right, even if the official's action would not have been improper if done for different reason. *Mt. Healthy City school Dist. Bd. of Education v. Doyle*, 429 U.S. 274 (1977). In order to prove a claim for retaliation, a plaintiff must establish the following elements: '(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.' *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)." *Toomer v. Garrett*, 155 N.C. App. 462, 478, 574 S.E.2d 76, 89 (2002).

A showing of selectivity sufficient to justify discovery against the Government in criminal cases is no small task and is very rare. "The burden on a party seeking to dismiss an indictment on the basis of selective prosecution is high. *Venable*, 666 F.3d at 900. Even when the Government so antagonized a district judge that he ordered production of privileged IRS CID manuals and then dismissed the indictment after the Government refused his order, the Fourth Circuit reversed, holding that the defendant's prominence in the community, rather than his political affiliation, was what pushed the referring agency over the edge of civil and into criminal liability. *See United States v. Hastings*, 126 F.3d 310, 314-15 (4th Cir. 1997). Notably, Plaintiff is and was anything but prominent in the North Carolina legal community, being only a solo practitioner in a rural county, and so disfavored even within that sphere as to be deliberately excluded from the county bar association. Also, the fact that only 12 of 37,000 tax delinquents

were prosecuted meant nothing without showing that the 12 were similarly situated for prosecutorial purposes. *See Hastings*, 126 F.3d at 316.  In *United States v. Graham*, 146 F.3d 6, 9 (1st Cir. 1998) the Government easily refuted the claim by listing eight good factors that explained why a former account executive was indicted, but not the bank she worked for, even though both were culpable.

Some defendants inevitably will succeed.  *United States v. Mumphrey*, 193 F.Supp.3d 1040, 1061 (N.D.Cal. 2016), taking "care not to define the similarly situated requirement too narrowly, *Chavez v. Ill. St. Police*, 251 F.3d 612, 635 (7th Cir. 2001) (§ 1983 selective enforcement case)," noted that "100% of the OSS [Operation Safe Schools] defendants are African American., which contrasts with the San Francisco Superior Court charging data obtained by Defendants (61.4% of those arrested and charged for drug-trafficking crimes in the Tenderloin were African American, 24.7% were Latino, and 10.7% were white)" and "Defendants have identified approximately **sixty specific instances in which non-African American drug dealers** were arrested for committing drug-trafficking crimes in the Tenderloin in recent years but were not federally charged under OSS. ... The Court agrees with Defendants that this is enough to satisfy the similarly situated evidence requirement for discovery purposes."  Government refusal to adduce "*any* declarations from SFPD officers or any nonsupervisory DEA agents about the actual operation of OSS[]" did not help.  *Id.* at 1054.

But this is not the standard for civil recovery.  Rather, *Olech* lowers the threshold considerably, requiring only a showing of unequal treatment, and *Olech* is not known to have any applicability to criminal matters.  However, if Plaintiff meets the *Venable* and *Olvis* criteria, he has certainly exceeded any necessary *Olech* recovery floor.

Plaintiff provides over 50 pages of dates, times, places, people, words, and actions regarding other lawyers' unaddressed misbehavior, easily satisfying *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) as well above "unwarranted inferences." In general, though selective prosecution claims "must be alleged with sufficient specificity to avoid being conclusory ... there is no heightened pleading requirement imposed on the plaintiff." *McWaters v. Rick,* 195 F. Supp. 2d 781, 791 (E.D.Va.2002). Plaintiff cites *infra* a number of cases denying dismissal on far weaker facts than here.

NCSB inevitably cries "speculation, conjecture, and opinion," DE9 at 11, without specifying which of the Amended Complaint's 456 paragraphs, many of which are drawn straight from public records, might be speculative, conjecturable, or opinionated. Significantly, neither does NCSB outright deny that if the Amended Complaint's allegations are true, the undisciplined lawyers mentioned therein are guilty of serious professional misconduct that has gravely harmed the public, including Plaintiff himself and his family.

### *Younger*, *Rooker-Feldman*, *Heck*, and *Bakewell* are inapplicable

NCSB invokes these cases by way of affirmative defense, but to no effect. Taking the last and simplest first, *Livingston v. Bakewell*, 232 N.C. App. 337, 757 S.E.2d 525 (2014) (unpublished), DE9 at 16-17, only estops Plaintiff from reasserting its *claims*, not from repleading its facts. Since it was decided on 12(b)(6) failure to state a claim, it cannot support any other form of estoppel by judgment, including collateral estoppel, as it found no facts. "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (citation omitted) (internal quotation marks omitted).

The other three doctrines miss the mark for one central reason: NCSB's state case against Plaintiff is over and its result is fixed. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 (1971) abstention is not possible because the state court proceedings in 15 DHC 15 ended with the North Carolina Supreme Court's denying discretionary review and dismissing Plaintiff's appeal no later than 11 May 2018. Still, Defendants falsely characterize the instant case as "nothing more than a collateral attack on the Order of Discipline[.]" DE27 at 6. This is not so, as Defendants know full well. Even if Defendants were to admit fault, apologize sincerely to Plaintiff's family, prosecute their protected lawyers to the fullest extent of the RRPCs, pay Plaintiff millions in damages, and quitclaim the State Bar Building to him, all of which would be fine with Plaintiff, none of it will restore Plaintiff's law license or alter DHC's judgment. *See Feldman*, *supra*. There is nothing *Younger* from which to abstain.

NCSB's cited authority such as *Fieger v. Thomas*, 74 F.3d 740, 750 (6th Cir. 1996) only applies to an active state case with which the federal courts are asked to interfere. Even if 15 DHC 15 were still percolating through the state courts, the appropriate course regarding damages would be at most to stay the action temporarily. *See Deakins*, *supra*; *Gilbert v. North Carolina State Bar*, 660 F.Supp.2d 636, 648 (E.D.N.C. 2009). As there is no state case left, this federal one must proceed.

Once the result is final, federal courts lack subject matter jurisdiction to sit as a state appellate court and stay, enjoin, modify, vacate, reverse, or overturn the results of a state proceeding that adheres to some pretense of due process. *See Rooker v. Fid.Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of App. v. Feldman*, 460 U.S. 462 (1983). Unfortunately for Defendants, since Plaintiff is not asking "the district court to conduct appellate review of the state court judgment itself, the *Rooker-Feldman* doctrine does not apply. *See Exxon Mobil Corp. v. Saudi

*Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)." *Thana v. Board of License Commissioners for Charles County, Maryland*, (4ᵗʰ Cir. 2016). Even if Plaintiff receives all requested relief, and he certainly should, the DHC order will remain undisturbed and in full force. DE9 at 8-9. The injury of selective prosecution stems, as the name suggests, from the prosecution itself, not the result. It will be noted that Plaintiff amended his complaint just before the limitations period expired on the commencement, not the termination, of 15 DHC 15.

### Selective prosecution has been well stated

It is nothing new or revolutionary to say that Plaintiff may proceed with his claim if he has pleaded systematically (or even one instance of) different treatment that is plausibly the work of "an evil eye and an unequal hand," *Grace Baptist Church v. City of Oxford*, 320 N.C. 439, 445, 358 S.E.2d 372, 376 (1987) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1073 (1886)). Any contention that only suspect classes enjoy equal protection is a considerable overstatement. Granted: "In general, unless a suspect class is involved, disparate treatment 'is presumed to be valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose"'" *King v. Rubenstein*, 825 F.3d 206, 221 (4ᵗʰ Cir. 2016) (quoting *Veney v. Wyche*, 293 F.3d 726, 731 (4ᵗʰ Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20, 113 S.Ct. 2637 (1993)). Still, "the Equal Protection Clause protects persons, not groups." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097 (1995).

"In order to establish a claim for selective prosecution, Plaintiff must allege that (1) a governmental agent or body intentionally accorded the plaintiff different treatment than it accorded other, similarly persons under the same law; (2) either the plaintiff is a member of [a] suspect class or the government's treatment of the plaintiff was entirely arbitrary, irrational, intentional, and unrelated to any governmental interest; and (3) the plaintiff suffered an injury that was caused by

the discriminatory treatment." *Hyatt v. Town of Lake Lure*, 225 F.Supp.2d 647, 660 (W.D.N.C. 2002). *McWaters v. Rick,* 195 F. Supp. 2d 781, 790-91 (E.D.Va.2002). Element (3) is incontestably satisfied, as Plaintiff even before the judgment had to pay costs for deposing Bettis and was forced to waste months' worth of working time.

Defendants concede element (1) by not even trying to state any rational reason for their failure and refusal to prosecute their protected lawyers for their words and deeds as pleaded in the Amended Complaint. Element (2) needs only a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000). *Olech* overrules any contrary position in *Oyler v. Boles*, 368 U.S. 448, 456 (1962). Plaintiff has further shown from years of NCSB's own publications that solo and small-firm lawyers are vastly more likely to be disciplined than large-firm and government lawyers, which defies all logic and common-sense expectations. Are we expected to believe that the thousands of large-firm and government lawyers *never* commit *any* serious professional misconduct, even in the face of daily temptations to bill more, convict more, win more? *Taylor v. Town of Franklin, N.C.*, No. 2:06cv13, 2007 WL 674577 *7 (W.D.N.C. 2007): "Although such claims "must be alleged with sufficient specificity to avoid being conclusory ... there is no heightened pleading requirement imposed on the plaintiff." *McWaters,* 195 F. Supp. 2d at 791. *Hyatt* went on to deny qualified immunity to individual government defendants for selective prosecution, noting that *Olech* stated nothing new, but did provide plenty of notice to reasonable officials in those defendants' shoes that selective enforcement is illegal and suable.

Just as in *Olech*, the precipitating event was a lawsuit against the government in question, ¶¶105-107, plus Plaintiff's beating the central charge in 06 DHC 11 (despite NCSB counsel's gratuitous rudeness and arrogance toward Plaintiff, ¶83, and despite DHC ignoring Plaintiff's ultimately successful summary judgment motion and leaving Plaintiff hanging for 14 months,

¶¶90-98). *State v. Garner*, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995) forbids prosecution motivated by "a defendant's decision to exercise his statutory or constitutional rights. *United States v. Goodwin*, 457 U.S. 368 (1982). In order for a selective enforcement claim to prevail, the defendant must show the prosecutorial system was motivated by a discriminatory purpose and had a discriminatory effect. *Wayte v. United States*, 470 U.S. 598 (1985)." "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)." *Goodwin*, 457 U.S. at 372. Plaintiff "must show more than simply that discretion has been exercised in the application of a law resulting in unequal treatment among individuals; he must show that the exercise of that discretion there has been intentional or deliberate discrimination by design." *In re Register*, 84 N.C. App. 336, 341, 352 S.E.2d 889, 892 (1987) (citations omitted) (quoted in *State v. Burroughs*, 196 N.C. App. 178, 674 S.E.2d 480 (2009).

Termination of the underlying proceedings in Plaintiff's favor is not an element of a selective prosecution or unequal treatment claim. In *Olech*, the plaintiffs were never even prosecuted, but as a result of a successful unrelated lawsuit against the defendant authorities, had been "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." Favorable *Olech* cites include *Patterson v Strippoli*, 639 Fed.Appx. 137 (3d Cir. 2017) (family ticketed twice for basketball goal in street while five neighbors were not); *Briner v. City of Ontario*, 370 Fed.Appx. 682, 705-06 (6th Cir. 2010) (sign ordinance enforced against plaintiffs but not others); and *Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383 (5th Cir. 2008) (improper motive includes preventing the exercise of a constitutional right). All Plaintiff is saying, or must say, is that Defendants have no rational reason for their coddling of many other lawyers obviously guilty of indistinguishable or far worse misconduct,

much of it against Plaintiff and his family, when they would have been equally easy to catch and prosecute. That is what *Venable* means by "similarly situated."

**Heck cannot bar relief if selective prosecution was unavailable as a defense**

At a minimum, *Olech* overrides any earlier SCOTUS opinion on the issue of civil recovery for violations of Fourteenth Amendment equal protection. Its floor of proof is well below that of *Heck*, *Armstrong*, and their progeny.

Criminal selective prosecution defense is covered in *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480 (1996). It might be a defense to SEC federal administrative proceedings. *See Gupta v. SEC*, 796 F.Supp.2d 503 (S.D.N.Y. 2011). It is certainly a cause for civil relief. Civil rights actions for wrongful conviction or sentence have as a precondition a showing of "the unlawfulness of [a plaintiff's] conviction or confinement, just as it has always applied to actions for malicious prosecution." *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), *quoted in Ballenger v. Owens*, (4th Cir. 2003). 512 U.S. 477, 489 (1994). But this is not an element of Plaintiff's cause for *selective* prosecution or enforcement. "In order to establish a claim for selective prosecution, Plaintiff must allege that (1) a governmental agent or body intentionally accorded the plaintiff different treatment than it accorded other, similarly persons under the same law; (2) either the plaintiff is a member of [a] suspect class or the government's treatment of the plaintiff was entirely arbitrary, irrational, intentional, and unrelated to any governmental interest; and (3) the plaintiff suffered an injury that was caused by the discriminatory treatment." *Hyatt v. Town of Lake Lure*, 225 F.Supp.2d 647, 660 (W.D.N.C. 2002) (citations omitted). Exoneration is not an element

Importantly, *Heck* by its own terms applies only when the underlying case was a criminal prosecution, while disciplinary proceedings are administrative matters of a civil nature. Assuming *arguendo* that selective prosecution is a defense to administrative complaints, Plaintiff has found

no authority holding *Heck* to require ultimate exoneration. Even if there were, it would not affect Plaintiff, because, first, the North Carolina Appellate Division has never approved a selective prosecution defense to lawyer discipline—rather the opposite; *see North Carolina State Bar v. Frazier*, 269 N.C. 625, 636, 153 S.E.2d 367, 374 (1967), oversimplifying a thieving lawyer's plea as "because all have not been prosecuted and punished, he should not be." Citing *Frazier*, *City of Gastonia v. Parrish*, 271 N.C. 527, 532, 157 S.E.2d 154 (1967) seemingly ruled out the possibility of selective *administrative* prosecution as a defense in North Carolina at all; "By analogy it may be said here that it is no defense to the defendants' alleged violation of the zoning ordinance that action has not been taken as to other violators."

Second, DHC ruled that Plaintiff could not use selective prosecution as a defense. This came about when Plaintiff sought discovery on evidence of selective prosecution, which contrary to popular belief is proper in a motion for summary judgment even in the absence of a defensive pleading. *See Dickens v. Puryear*, 302 N.C. 437 441-42, 276 S.E.2d 325, 328 (1981). Plaintiff specifically noted Bettis' untruths under oath, R112-17, and extensive previous professional misconduct, much of it directly against Plaintiff and his clients, such as raising frivolous defenses and accepting innocent third parties' money from the fraudsters who defrauded them, in at least three 15 DHC 15 papers: 10 November 2015 motion to enforce subpoena duces tecum, R58-59, 74; 10 November 2015 motion to compel discovery and for sanctions, R84-86, 95-96; and 12 November 2015 opposition to protective order, R129-130.

In a 13 November 2015 response, NCSB by and through Hodge specifically opposed Plaintiff's discovery requests on grounds of "harassment" and that selective prosecution is not a defense to disciplinary proceedings ("There is an argument that the defense of selective prosecution is limited to the criminal context.") and that even if it were, Plaintiff had made no

prima facie showing that others had been differently treated because, *inter alia*, Lee Bettis always tells the truth. R150-51. In other words, you need evidence to prove selective prosecution, but without evidence of selective prosecution already in hand, you can't prove the need for discovery of evidence, so discovery should be denied on grounds of Catch-22.

As NCSB wanted, the panel chair ruled on 24 February 2016: "6. The status of the pleadings and the nature of the administrative proceeding do not justify discovery by deposition on the topic of selective prosecution of [*sic*; should be "or"] vindictive prosecution." R231. There was no factual finding as to whether Plaintiff had made a prima facie showing of unfair treatment, so Defendants lack that element of collateral estoppel. Indeed, collateral estoppel runs in Plaintiff's favor, as it is now settled between the parties that selective prosecution is not a defense before DHC. "Whereas res judicata estops a party or its privy from bringing a subsequent action based on the "same claim" as that litigated in an earlier action, collateral estoppel precludes the subsequent adjudication of a previously determined issue, even if the subsequent action is based on an entirely different claim." *Whitacre P'ship v. BioSignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004). It might even amount to judicial estoppel, which protects the integrity of the courts against "the perception that either the first or the second court was misled." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) (quoted in *Whitacre P'ship*, 358 N.C. at 29).

This time, instead of baldly misrepresenting facts as before ("Plaintiff did not raise selective prosecution as a defense before the DHC[.]" DE9 at 9), Defendants more craftily argue that "Plaintiff did not defend his disciplinary proceeding on selective prosecution." DE27 at 6. This is because, as just stated, he was not allowed to. It is also most curious that Defendants purport to admit to the existence of a selective prosecution defense just to evade Plaintiff's civil claim, as that position seemingly would bind it in all future cases, gifting a silver bullet defense to

15

quite a few DHC defendants. But NCSB cannot here gainsay its official policy that there is no selective prosecution defense to its senseless capricious discrimination, enshrined in 27 NCAC 01B .0101.

**Defendants offer no rational reason for not prosecuting Wallace, Bettis, Parsons et al.**

The complained-of action must have "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Thus, a plaintiff must show not only that similarly situated individuals were treated differently, but that there was "clear and intentional discrimination." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Factors include (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings. *Sylvia Dev.*, 48 F.3d at 819 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)).

Factors (2) and (4) are satisfied by 27 NCAC 01B .0101, NCSB's official policy of intentional and irrational discrimination, and (3) by the same rule's disallowance of selective prosecution as a defense, as well as ¶115: "NCSB did not offer a plea bargain of any sort even though Plaintiff asked about it, did not inform Plaintiff it would be seeking active suspension until Plaintiff asked about it during a break after trial started, and never inquired as to whether Plaintiff might be having problems with depression, mental illness, substance abuse, or other ailments that often factor heavily in professional misconduct and for which NCSB can offer help and treatment."

*Olech* firmly established that unequal treatment, without much more, is suspect enough, and the Fourth Circuit has faithfully and repeatedly invoked *Olech* to uphold, or at least to foreclose immediate dismissal of, class-of-one claims. Though recreational dancing is not First Amendment-protected expression, singling out one dancer for banishment without rational basis is Fourteenth Amendment anathema. *See Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 263 (4th Cir 2005). *Martin v. Duffy*, 858 F.3d 239, 250-51 (4th Cir. 2017) backed a prisoner's rights to file grievances without subsequent retaliation, for which qualified immunity was no defense and *Heck* exoneration no prerequisite. Only if the government's actions have a rational basis may Plaintiff's action fail. *See Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548 (4th Cir. 2013). Defendants, despite ample opportunity, will not—or cannot—come up with any.

**NCSB's own statistics prove discrimination against solo practitioners**

Statistics matter "in cases in which the existence of discrimination is a disputed issue." *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 339 (1977). Here, NCSB has helpfully compiled records proving that it systematically discriminates against solo and small-firm practitioners, complete with pie charts and other thoughtful graphics. Logically, big-firm lawyers are at least as subject to ethical temptation, since in their early years they must rack up billable time furiously, and if they make partner-manager-shareholder, they then must pay the bills for large staffs, impressive offices, and massive overhead. It is beyond credibility that almost all big-firm lawyers are ethically perfect, so the reason for their escape from judgment must be something other than actual innocence.

*Hunter v. Underwood*, 471 U.S. 222, 227 (1985) found "the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was 'indisputable evidence that the state law had a discriminatory

effect on blacks as compared to similarly situated whites.'" *Chavez*, 251 F.3d at 638. Though solos are only 41% of North Carolina lawyers, they are 74%, or three-quarters, of lawyers disciplined in DHC orders. ¶¶117-23. The ratio 74/41 works out to 1.8, exceeding *Hunter*'s threshold.

The reason for disparate treatment cannot be lack of resources, since each of the 17 staff counsel at NCSB averages not even three DHC cases and two days in court per year, yet somehow require a full complement of paralegals and investigators to help them achieve even that, and the celebrated Bar Center sits 97% empty. ¶¶124-35. Lawyers are easy to find, as each must keep an active address on file, and if a lawyer cannot be found, then failure to cooperate with an investigation or contest a disciplinary action results in default. These facts prevent NCSB from hiding behind *Selective Service Sys. v. MPIRG*, 468 U.S. 841, 863 (1984) where "of the draft-eligible population of 9,039,000 men, 674,000 had failed to register[.]" (Marshall, J., dissenting). "The barrier to prosecuting Military Selective Service Act violators is not so much the Government's inability to discover a birth date or date of registration as the difficulty of in identifying the 674,000 nonregistrants." 468 U.S. at 863.

"Thus, there are four elements to a 'class of one' Equal Protection claim: (1) treatment that is intentionally; (2) different; (3) from others similarly situated; (4) without a rational basis for the difference." *Kowalski v. Berkeley County Public Schools*, No. 3:07-CV-147, 2009 WL 10675108 *11 (N.D.W.Va. 2009) (citing *Willis* at *id*.). NCSB does not bring DHC cases by accident, but by premeditated intent, satisfying element (1). Elements (2), (3), and (4) are shown by both NCSB's own records proving disciplinary discrimination against solo practitioners and Plaintiff's own experience compared to that of at least six known similarly situated lawyers, to wit, they committed the exact same and far worse misconduct for which Plaintiff was prosecuted, but NCSB knows

about this and has done absolutely nothing, despite NCSB's "polar star" of public protection. Among these lawyers' victims are Plaintiff himself and his family, but apparently these lawyers are above the law, while Plaintiff and his family are beneath its protection, so long as NCSB is running the show. Nowhere do Defendants offer a credible rationale for its double standard.

This is all that some courts need to go on. "Therefore, plaintiffs do not have to provide the court with the name of an individual who was not stopped; instead they may attempt to use statistics to show that the [police] treated them differently than other motorists who were similarly situated." *Chavez*, 251 F.3d at 640. "*See also United States v. Alabi*, 597 Fed.Appx. 991, 996 (10th Cir. 2015) (identifying "three possible methods of proving discriminatory effect in a selective-enforcement case: statistical evidence; the identification of a similarly situated individual who could have been, but was not stopped and arrested; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similar discriminatory behavior")" *Johnson v. Holmes*, No. 3:16cv16, 2017 WL 4707463 *6 (W.D.Va. 2017) (denying parts of officers' summary judgment motion). Note that the requirement is just *one* other person *one* time. In this case, there are at least half a dozen such persons, who have been harming the public over a 12-year span with Defendants' aid, comfort, and blessing.

### Pointing fingers and naming names

"As the Seventh Circuit has explained, in a case involving racial profiling in traffic stops: 'In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.' *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001)." *United*

*States v. Hare* (4th Cir. 2016). Plaintiff has done just so, generally in ¶¶108-16 and specifically as to at least six lawyers that NCSB has refused to prosecute or discipline. Predictably, Defendants label the following excruciatingly detailed averments "speculative and conclusory and do not have to be accepted by the Court as true." DE27 at 14. Actually they do. *See Mayes*, *supra*.

**Riddle, Garriott, Reich**

In 06 DHC 11, NCSB prosecuted and obtained discipline (a public admonishment) for UPL by ghostwriting. ¶¶140-48. At the same time, Utah (not North Carolina) lawyers Daniel Garriott (his ghostwriter even misspelled his name "Garriot" on his motion to dismiss) and Bret Reich submitted identical motions to dismiss, purportedly written and signed pro se, in Plaintiff's 05 CVD 340 action against them in Bladen County District Court. Though NCGS § 84-2.1 defines "practice law" as *inter alia* "the preparation and filing of petitions for use in any court, ... or assisting by advice, counsel, or otherwise in any legal work;" yet NCSB refused to take action against them even though all it had to do was inform its own Authorized Practice Committee and ask the appropriate district attorney to enjoin and indict UPL per § 84-7. ¶¶150-53.

Later, to show how easy it is, NCSB successfully prosecuted Plaintiff again for UPL in 15 DHC 15 solely because he accepted clients referred to him by people who were ghostwriting. Particularly since Riddle, Garriott, and Reich did their UPL in a North Carolina court (the integrity of which NCSB is supposed to protect) to Plaintiff's (remember, even Plaintiff is part of the public that NCSB is supposed to protect) detriment, NCSB's refusal to prosecute them was and is inexcusable. It also began a 12-year pattern of official NCSB discrimination against Plaintiff and in favor of whoever harms Plaintiff, his clients, and his family.

**Bettis**

As to Lee Bettis, NCSB has full actual knowledge of his misdeeds against Plaintiff and his clients, and that Bettis is a convicted child abuser and impaired driver with obvious self-control and substance abuse issues who has brought the profession into public discredit and ridicule, not to mention put innocent people's lives, safety, and property at grave risk. Any other lawyer would be offered the options of either a confidential treatment contract or a public disciplinary action. But because Bettis was key to the case against Plaintiff, Bettis is untouchable.

Too long to rehash here, ¶¶247-452 gives names, dates, places, and where possible exact quotes detailing Bettis' misconduct, including but not limited to threatening Plaintiff's safety (recall that Bettis claims to be some sort of mob lawyer with clients including John Gotti), contacting two of his clients without permission, swearing at him before witnesses and on the phone, threatening to sue him without any basis in fact or law (exactly what NCSB disciplined Plaintiff so severely for), gross and gratuitous disrespect, misrepresenting numerous facts and laws to courts, submitting a proposed order with findings that the judge did not make and which the judge noticed and returned, representing both a thief (Bob Lindsey) and the people he stole from (Bob and Colleen Lock and Phil Manger), continuing to represent Manger and claiming Manger does not owe the $89,400 that this Court awarded Plaintiff's clients against Manger, and misrepresenting many material facts to NCSB in an ultimately successful effort to get Plaintiff's law license suspended. NCSB's deliberate and knowing refusal to discipline Bettis or at least get him some help for his substance and anger problems is without rational basis and has caused Plaintiff and his clients to deeply distrust the courts and disciplinary system.

**Parsons**

As to Gary Parsons, he and NCSB have a close relationship, as seen from the *Livingston v. Bakewell* complaint that NCSB sent him and which he filed as an exhibit in *Caraballo*. There is

no other reason for him to have obtained that complaint out of the thousands filed every month in Wake County Superior and District Courts. This chummy relationship, and the unwillingness to admit that people who complain about Plaintiff may also be in the wrong sometimes, is why Parsons was able to overcharge clients by 700%, file false timesheets under oath, and file false statements under oath that Plaintiff has paid nothing (Plaintiff has the original money order receipts proving otherwise) with absolute impunity. NCSB knows full well about this, because it monitors Plaintiff's federal cases and could see that Parsons began the process of registering the judgment in Bladen. ¶¶226-45. False swearing is easily cause for active suspension or disbarment. ¶246. It would not require a day's work to prepare an airtight case against Parsons, and barely another day to try him before DHC, but NCSB refuses without reason to do something so simple.

### Wallace, plus Middleton and Speer

As to Mona Lisa Wallace, she and her for-profit war on family swine farmers, incorporating illegal and discriminatory case-running to recruit hundreds of naïve clients all over southeastern North Carolina, appeared not just in "a newspaper article" but in dozens of articles since July 2013 by sympathetic media, particularly the Raleigh *News and Observer*, which is NCSB's hometown newspaper. Attached are just a few of them, most notably a 28 April 2017 N&O piece covering Wallace's erstwhile confederates Richard Middleton and Charles Speer, out-of-state lawyers who obtained clients the old-fashioned way—case running—that Wallace happily accepted, knowing full well they had been illegally recruited. A Wilmington *Star-News* article of 24 September 2013 related the specific complaint of a Clarkton (Bladen County) resident that a Middleton Law Firm case runner barged onto her porch uninvited one day and tried to sell her on hog farm litigation even though she had no hog farm problem and did not want a lawyer. The Sampson *Independent* ran a number of stories in late 2013 on case running, including an October

2013 article relating Speer and Middleton's throwing all blame on Wallace, for whom they had been working and who had "actively assisted our law firm [which was not admitted pro hac at the time] in preparing and drafting complaints and other pleadings," the same offense of assisting UPL for which NCSB prosecuted Plaintiff. But Speer and Middleton said nobody had complained to NCSB and presumably they had received no letters of notice or other enforcement action from NCSB. So NCSB thinks assisting UPL is bad when Plaintiff does it, but perfectly acceptable when Mona Lisa Wallace does it.

Likewise, filing claims with incorrect allegations against people who prove to be not responsible for damages is a grave offense for Plaintiff, but right as rain when Wallace does it, particularly when those falsely accused are Plaintiff's family and hundreds of other innocent, law-abiding farm families. Summarizing the Amended Complaint, Wallace enshrined at least the following misrepresentations in Wake County files 13 CV 9126 and 13 CVS 10407, so sloppily prepared that she failed even to get the entity name right (The Turnbull Company, LLC):

¶¶174-81: Plaintiff's family intentionally polluted neighbors' property, when it is judicially noticeable that the closest of those neighbors lives 0.75 miles away, most of them live over two miles away, and two of the complainants lived 25 miles away. Plaintiff's family could not possibly have discharged waste onto those properties if they had *tried* to.

¶¶200-13: Plaintiff's family "negligently, improperly, and/or grossly mismanaged and operated" their farm, violated setback requirements, deprived neighbors of use of their property, generated "excessive buzzards" and truck traffic, all of which are judicially noticeably false by the fact that several families live much closer to, and two of them *on*, the farm property than Wallace's clients without ever complaining (for that matter, Wallace's clients never complained in the then-20-year history of the family farm, nor have any complained since).

Additionally, in NCED 7:14cv180-BR, DE32 at 38, Wallace kept slinging calumny at Plaintiff's family, falsely stating "Turnbull Company Farms LLC [*sic*; she *still* cannot get right something as simple as a company name] ... adds to the nuisance by the additional volume of [Smithfield's] large hog trucks traveling on Highway 53 past the Plaintiffs' homes." This refers to the intersection of 53 and Gum Shaw Road, through which Plaintiff has driven thousands of times and has hardly ever seen farm-related trucks there, since at most an average of one large truck a day, many of which do not belong to Smithfield, visits Plaintiff's family farm.

¶¶188-91: Wallace organized a defamatory media campaign designed to prejudice juries against family hog farms and to recruit more plaintiffs to her new litigation, a campaign that continues to this day (compare NCSB witness' false testimony in 15 DHC 15 that Plaintiff had appeared on TV news calling certain lawyers "fraudsters and money launderers" *just one time*, T622, which never even happened, but led to severe punishment for Plaintiff anyway).

¶¶221-23: Wallace recruited only African-American complainants not of Hispanic origin, though many persons of European and Latin American descent live closer to Plaintiff's family's farm than do her clients.

So it is seen that Mona Lisa Wallace has been violating the same rules (*inter alia*, RRPC 3.1, 4.1, 4.4(a), and 8.4(d)) that NCSB very harshly applies to Plaintiff, defaming and distressing hundreds of law-abiding farm families and costing Smithfield untold millions. NCSB does not deny that she is guilty of serious professional conduct and caused incalculably more public harm than Plaintiff ever supposedly did. But NCSB will not touch her and even claims not to be aware of the problem, though her exploits and Speer-Middleton case running have been reported in its hometown paper for five long years. The only explanations are her generous financial support for

the Democrat Party, ¶225, delight in seeing Plaintiff's family dragged through the mud, and sheer discrimination in favor of wealthy and politically connected lawyers.

Defendants attempt to shirk their constitutional duty of equal protection by noting "that not every instance of attorney misconduct by others has been prosecuted." DE27 at 14. What Plaintiff pleads is that **NO other instance of misconduct has been prosecuted**—not one. Defendants toss around "strength of evidence, timing, and use of resources[,]" *id*, but do not specify what evidence they may lack, do not deny that NCSB is overstaffed and underworked, and do not say what "timing" even means.

NCSB earlier protested, *see* DE9 at 17, that Plaintiff has not alleged that he notified NCSB of these six lawyers' misconduct. As Defendants know full well, NCSB's own confidentiality rule forbids Plaintiff to disclose whether he has filed any grievances against any other lawyer, or whether he knows of others who have done so, without NCSB or complainees' consent. This time, Defendants do not deny that it is not so much Plaintiff's duty to serve as a confidential informant as it is *Defendants'* duty to investigate and prosecute misconduct. They just refuse to do it.

### *Corum* authorizes damages directly from the State

"It is well established that sovereign immunity does not protect the state or its counties against claims brought against them directly under the North Carolina Constitution. *See Corum*, 330 N.C. at 785-86, 413 S.E.2d at 291." *Peverall v. County of Alamance*, 154 N.C. App. 426, 430, 573 S.E.2d 517, 519 (2002). In its previous memorandum, written before service of process upon Defendants Hodge and Silverstein, NCSB spent 17 pages arguing that Plaintiff has no federal remedy, but then said Plaintiff must have a state law remedy, *see* DE9 at 19, without hinting at what it might be. Now that Hodge and Silverstein are here, they hoist the "not me" flag (just as Plaintiff forecast; *see* DE15 at 26), hiding behind governmental immunity from paying damages

or even from suffering the indignity of a trial. "As a matter of law, no claim for damages pursuant to the *Corum* doctrine lies against state officials acting in their individual capacities. ... Accordingly, Plaintiff has no state law claim against either Hodge or Silverstein." DE27 at 16. If so, then this is no problem, because the North Carolina Supreme Court has installed an uninterruptible power supply of justice that automatically connects rights-deprived citizens to the State itself—and since the same counsel represents all three Defendants, NCSB, *i.e.*, the State itself, has admitted its liability under *Corum*. No negligence is apparent, just an intentional policy and practice of discrimination against Plaintiff, so no proceeding before the Industrial Commission under the Tort Claims Act, *see* NCGS § 143-291, is available as it was in, *e.g.*, *Taylor v. Wake County*, __ N.C. App. __, __, 811 S.E.2d 648, 656-57 (2018).

Even though its lawyers enjoy what looks like the lowest workload in American legal history, and even though they occupy a palatial new building whose courtrooms lie almost unused, and even though they are virtually guaranteed to win before DHC every time, and even though its reputation as a private police force for the big firms could and would be greatly rehabilitated by disciplining the likes of Parsons, Bettis, and Wallace for their plain professional misconduct, NCSB adamantly sits on its hands. Sadly, no writ lies to compel NCSB to discipline those who intentionally abuse Plaintiff and harm his former clients and defame his family. *See Boyce v. North Carolina State Bar*, __ N.C. App. __ (2018) (slip op.). So it is seen that NCSB's "polar star" is not public protection, but private revenge against Plaintiff.

Sovereign or governmental immunity, and in the case of Silverstein and Hodges absolute prosecutorial immunity, is to say the least a tough nut to crack when seeking damages. *Imbler v. Pachtman*, 424 U.S. 409 (1976) bestowed *carte blanche* upon criminal prosecutors to do anything they want to anybody they want, for any or no reason, without the slightest consequence

whatsoever, period, so long as it is in their capacity as prosecutor. Most, and perhaps all, courts have extended *Imbler* to legalize administrative prosecutors' constitutional vandalism as well. *See Ostrzenski v. Seigel*, 177 F.3d 245, 249 (4th Cir. 1999) (citing a string of opinions supporting its holding that *Imbler* exempts medical disciplinary authorities from all responsibility for their misdeeds). *See*, *e.g.*, *Fuller v. Wake County*, __ N.C. App. __, 802 S.E.2d 106 (2017).

But the North Carolina Supreme Court has correctly installed a constitutional hack right through such nonsense. "This Court could hardly have been clearer in its holding in *Corum* [*v. University of North Carolina*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992)]: '[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution.'" *Craig v. New Hanover Co. Bd. Of Educ.*, 363 N.C. 334, 338, 678 S.E.2d 351, 355 (2009). "It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity. ... Thus, when there is a clash between these constitutional rights and sovereign immunity, the constitutional rights must prevail." *Corum*, 330 N.C. at 785-86 (quoted in *Craig*, 363 N.C. at 339). These holdings by North Carolina's highest court of course bind all federal courts. Alternative pleading of *Corum* and *Craig* relief, if other state remedies prove ineffective, is allowed, and Plaintiff has done just that in ¶454. *See Evans v. City of Durham*, No. 1:07cv739, 2011 U.S. Dist. LEXIS 156711 *148-49 (M.D.N.C. 2011) (rev'd and remanded in part on other grounds *sub nom Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012)).

There is no case for negligence such that a tort claims act before the Industrial Commission could be even attempted. It is, naturally, just fine with Plaintiff if Hodge and Silverstein can be

held personally liable, but that is admittedly unlikely. Thus NCSB, a state agency created by statute (though that statute provides for essentially no state oversight and is little more than a letter of marque and reprisal that lets the privateers in charge of NCSB do anything they want), *is* the State and must pay Plaintiff for selective prosecution, should its employees Silverstein and Hodge prove immune.

Per the standard they impose on Plaintiff, *see* DE27 at 4-5, any arguments not in Defendants' Motion, particularly any rational basis for refusing to prosecute the similarly situated lawyers thoroughly described above, are waived. Plaintiff need not suggest additional defenses and cannot formulate any opposition to what was not on paper.

WHEREFORE Plaintiff requests that Silverstein and Hodge's (DE26, 27) Motion to Dismiss and Memorandum in Support be denied in all respects, and that any dismissal be without prejudice and with leave to amend in an attempt to cure any pleading deficiencies.

Respectfully submitted,

/s/Christopher W. Livingston
Christopher W. Livingston, Plaintiff Pro Se, NCBN 27282
PO Box 220, White Oak NC 28399
Phone 910 876 7001
Email usriflecaliber30m1.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **9 September 2018** I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of such filing to:

David R. Johnson
The North Carolina State Bar
217 East Edenton Street
Raleigh NC 27601
djohnson@ncbar.gov

Philip A. Collins
Bailey & Dixon, LLP
PO Box 1351
Raleigh NC 27602
pcollins@bdixon.com

/s/Christopher W. Livingston
Christopher W. Livingston, Plaintiff Pro Se, NCBN 27282
PO Box 220, White Oak NC 28399
Phone 910 876 7001
Email usriflecaliber30m1.com